# UNITED STATES DISTRICT COURT OF COLORADO

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

AUG 24 2020

JEFFREY P. COLWELL
CLERK

UNITED STATES OF AMERICA,
                Plaintiff

    v.

JOEL THOMAS,
                Defendant

Case No. 1:19-cr-00397-CMA-1

---

## MOTION TO REDUCE SENTENCE PURSUANT 18 U.S.C. §3582(c)(1)(A)(i) (COMPASSIONATE RELEASE)

---

### Introduction

The defendant, Joel Thomas, appearing PRO SE, respectfully moves this Court pursuant to 18 U.S.C. §3582(c)(1)(A)(i) to reduce his sentence to time served. As amended by the First Step Act, the compassionate release statue allows courts to reduce sentences for "extraordinary and compelling" reasons. The growing coronavirus pandemic, which public health experts and policymankers recognize will be especially dangerous in the confines of correctional institutions, is a an extraordinary and compelling circumstance. Because of his age compounded with his underlying health issues, Mr. Thomas is among those who at the highest risk of death or serious illness if he is exposed to the disease. This risk combined with the totality of the circumstances, warrants an immediate sentence reduction to time served.

Mr. Thomas has been in custody with the present offense since Feb, 4, 2020 which amounts to 7 months of actual incarceration.  Counting the good time credits earned he has served approximately 12 months of his sentence of 48 months.  His conduct in prison has been exemplary and displays the highest of work ethics working in the electrical shop.  He has paid all of his financial obligations prior to self-surrendering.  He has completed several ACE classes despite the COVID "lockdown".  He has several health issues along with the burden of several from his family.  He currently suffers from Post Traumatic Stress Disorder, insomnia, depression and headaches. These are compounded by his son is currently in counseling for suicidal thoughts because of his fathers incarceration, (his son is 10 years old), his father-in-law suffered a major stroke in August of 2019 which left him in hospice care.  The family has a history of high blood pressure, heart attacks and prostrate cancer.  This burden is solely on his wife to maintain the family.

He applied for a compassionate release in May 2020 but the Informal Resolution (BP8) was returned as "Unable to resolve".  It was reject for review by the warden.

**Statutory Framework for Sentence Reduction Authority Under 18 U.S.C. §3582(c)(1)(A)(i)**

The compassionate release statute grants sentencing courts authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. §3582(c)(1)(A)(i). The statute provides:

(1) in any case--

(A)**the court**, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exahusted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion of the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, **may reduce the term of imprisonment** (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), **after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that --**

(i) **extraordinary and compelling reasons warrant such a reduction;**...

**\*\*\*\*\*\*\***

**and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission,**

18 U.S.C. §3582(c)(1)(A). Thus, the statutory requirements for sentence reduction are that the court (1) find extraordinary and compelling reasons for the reduction, (2) consider the relevant sentencing factors under 18 U.S.C. §3553(a), and (3) ensure any reduction is consistent with applicable policy statements.

**Relevant Facts and Procedural History**

On Jan. 12, 2020, Joel Thomas was sentenced to 48 months in prison upon a guilty plea for 18 USC §2252A9(a)(5)(B) and (b)(2). The offense last occurred August 2, 2013, 6 years and one month before the plea. No additional crimes took place during that period, he was sentence at the bottom of his sentencing range and self surrendered on Feb. 4th, 2020.

Argument

**A. The Court Has Authority to Consider Mr. Thomas's Motion Bcause More than 30 Days have Elapsed Since the Request was Received by the Warden**

Although the compassionate release statue previously permitted sentence reductions only upon a motion of the Director of the Bureau of Prisons(BOP), COngress expanded the statute in the First Step Act of 2018. Pub L. 115-391 §603(b), 132 Stat. 5194, 5239 (Dec. 21, 2018). As amended, §3582(c)(1)(A)(i), now permits courts to consider motions filed by the defendant so long as "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, **whichever is earlier[.]**"

The reason for the expansion to include defense-filed motion was the "documented infrequency with which the BOP filed motions for s sentence reduction on behalf of defendant's." United States v. Redd, NO. 1:97-CR-000060AJT, 2020 WL 1248493, at *7 (E.D. VA. Mar. 16, 2020). Accordingly, "while the First Step Act did preserve the BOP's role relative to a sentence reduction in certain limited respects, it eliminated the BOP Director's role as the exclusive channel through which a sentence reduction could be considered by courts." Id.

In this case, the timing provision has been satisfied. Mr. Thomas submitted a request for reduction in sentence to the warden of his facility on May 6th, 2020, more than 30 days ago, providing the basis for the Court to consider Mr. Thomas's motion. See united States v. Spears, No. 3:98-CR-02080SI-22, 2019 WL 5190877, at *2 (D. of Or. 15, 2019)(granting the defendant's compassionate release motion on the first business day after the 30-day period expired); United State v. Robinson, 2019 WL 2567356, at *2 (W.D. Wash. June 21, 2019)(staying consideration of a compassionate release for exactly the 30-day period. This motion is ripe for review on the merits.

The reason for the expansion to include defense-filed motions was the
"documented infrequency with which the BOP filed motions for a sentence
reduction on behalf of defendants." United States v. Redd,
No. 1:97-CR-00006 AJT, 2020 WL 1248493, at *7 (E.D. Va. Mar 16, 2020).
Accordingly, "while the First Step Act did preserve the BOP's role relative
to a sentence reduction in certain limited respects, it eliminated the BOP
Director's role as the exclusive channel through which a sentence reduction
could be considered by the court." Id.

Though the warden has denied the request and the defendant has been
instructed to continue with the administrative process. Further administrative
procedures will prove futile, because the delay places the defendant at
risk and possible irreparable harm. There is serious doubt whether the
BOP could or would grant effective relief given the seriousness and rapid
impact that COVID-19 can have on a densely packed population. (Quoting
Granberry v. Greer, 481 U.S. 129, 134 (1987)) (recognizing that "exceptional
circumstances of peculiar urgency" can excuse exhaustion). Delaying consider-
ation of this motion would put defendant's life in danger and risk
irreparable harm. See Matter of Extradition of Manrique, No. 19MJ71055,
2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (refusing to delay consider-
ation of release to await evidence of an outbreak in the jail because that
"may be too late").

### MOVANT'S Vulnerability to COVID-19 Is an Extraordinary and Compelling Reason for an Immediate Sentence Reduction to Time Served.

The Compassionate release statute does not expressly define or limit
what constitutes an "extraordinary and compelling" reason for a sentence
reduction. Black's Law Dicitionary, however, defines "extraordinary as
"[b]eyond what is usual, customary, regular, or common," BLACK'S LAW
DICTIONARY (10th ed. 2014). Its definition of "compelling need," is one
so great that irreparable harm or injustice would result if [the relief]

is not [granted]." ID.  The present global pandemic is a quintessential extraordinary circumstance beyond what most Americans have experienced in their lifetimes.  The grave risk to Mr. **Thomas**        from continued incarceration provides a compelling reason for his immediate release.

> 1.  The Court Has the Authority to Find Extraordinary and Compelling Reasons Other than Those Expressly Identified in Commentary to U:S.S.G. §1B1.13.

In 28 U.S.C. §994(t), Congress delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of examples."  The policy statement issued in exercise of that authority, U.S.S.G. §1B.13, provides examples of "extraordinary and compelling reasons" only in the *application notes*.  The examples fall into *four* categories based on a defendant's (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health in combination with the amount of time served, or (4) compelling family circumstances.  U.S.S.G. §1B13 comment, n1(A)-(C).  The commentary also includes a fifth catch-all provision for "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined  by the Director of the Bureau of Prisons. U.S.S.G. §1B13, comment. n.1(D)

However, the policy statement was last amended in November 2018, before the First Step Act was passed, and it still requires a motion filed by the BOP.  For that reason, "a growing number of district courts have concluded the Commission lacks" a policy statement applicable to the post-First Step Act statue.  United States v. Mondoca, No. 89-CR-0655 DMS, 2020 WL 1029024 (S.D. Cal. Mar 3. 2020): see also United States v. Brown, 411 F. Supp. 3d 446, 449 (S.D. Iowa 2019) citing cases.  In the United States v. Cantu, the court explained:

> Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. §3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate

that the policy must provide guidance on the appropriate use of sentence-modification provisions under §3582.

No. 1:05-CR-458-1, 2019 2498923, at *4, (S.D. Tex June 17, 2019). Similarly in Redd, the court noted that §1B13 "by its terms applies only to motions of compassionate release filed by the BOP Director, not motions filed by the defendants." 2020 WL 1248493, at *6 (E.D. Va. Mar 16 2020). Therefore, the court concluded, "there does not currently exist, for the purposes of satisfying the First Step's Act's 'consistency' requirement, and 'applicable policy statement'". Id.

Even where the courts have not deemed ¶1B13 entirely inapplicable due to the lack of amendment, they held that judges have the authority based on the catch-all provision in Application Note 1(D) to find extraordinary and compelling reasons other than those listed. See, e.g. United States v. Fox, No. 2:14-cr-03-DBH, 2019 WL 3046086. *3 (D. Me. July 11, 2019) (stating that the existing policy statement provides "helpful guidance," but "is not the ultimately conclusive given the statutory change"). In Redd, the court explained that "Application Note 1(D)'s prefatory language, which requires a determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance." 2020 WL 1248493, at *7 (citing cases); se also United States v. Perez, No. 88-10094-I-JTM, 2020 WL 1180719, at *2(D. Kan. Mar 11, 2020)("[A] majority of federal district courts have found that the most natural reading of the amended §3582(c) and §994(t) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it." (internal quote marks omitted.)).

The government conceded this point in United States v. Young, agreeing that "the dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act."  No. 2:00-CR-00002-1, 2020 WL 1047815, at *2 (M.D. Tenn. Mar 4, 2020).  The court in Young followed the majority of district courts in recognizing that §1B1.13's defined categories are not exclusive: "In short, federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction." Id at *6 [1]

Accordingly, this Court has the authority to consider whether the worsening global pandemic, combined with the other relevant circumstances in this case, present an extraordinary and compelling basis for a sentence reduction, regardless of whether it falls within one of the existing categories in §1B1.13 commentary.

---

[1] See also United States v. O'Bryan, No. 96-10076-03-JTM, 2020 WL 869475, at *2 (D. Kan. Feb 21, 2020); United States v. Maumau, No. 2:08-cr-00758-TC-11, 2020 WL 806121. at *2-3("[A] majority of district courts to consider the question have embraced Mr. Maumau's position" that limiting the catch-all provision to circumstances identified by the BOP is inconsistent with the law") (citing ten other cases); Brown, 411 F. Supp. 3d at 451 ([I]f the [First Step Act] is to increase the use of compassionate release, the most natural reading of the amended §3582(c) and  §994(t) is that the court assumes the same discretion as the BOP Director when it considers a compassionate release motion before it. . . . Thus, the Director's prior interpretation of 'extraordinary and  ^ compelling' reasons is informative, but not dispositive." (internal quotation marks and citations omitted));  United States v. Beck. No. 1:13-CR-186-6, 2019 WL 271505, at *5-6 (M.D.N.C. June 28, 2019)("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentece reduction under §3882(c)(1)(A)."  (internal citation omitted)).

2. COVID-19 Is an Unprecedented and Rapidily-Expanding Global Health Emergency that Presents a Serious Risk to Vulnerable Prisoners.

On March 11, 2020, the World Health Organization officially classified the new strain of coronavirus which causes COVID-19 as a pandemic. WHO Characterizes COVID-19 as a Pandemic, World Health Organizations (Mar 11, 2020), http:bit.ly/2W8dwpS. "COVID-19 is a serious disease" that makes certain populations of people severally ill and can lead to death. Declaration, Chris Beyer, MD, MPH, Professor of Epidemiology, John Hopkins Bloomberg School of Public Health. ¶5(March 16, 2020). The current best estimate is that the fatality rate among all demographics "is 5-35 times the fatatity associated with influenza infection." Breyer. ¶5.[2]

COVID-19 has infected more than 17,600,000 people worldwide, and has lead to more than 680,000 deaths as of August 1, 2020. (CNN) Coronavirus COVID-19 Global cases, center for Systems Science and Engineering (CSSE) at John Hopkins University, https://coronavirus.jhu.edu/map.html (updated regularly) (last accessed March 30, 2020 at 9:03 a.m.) On March 26, 2020, the United States became the global leader in COVID-19 infections. (CNN News August 1, 2020) Over 4,500,000 cases and over 153,000 deaths in the US. Tom Porter, the US is Well on the Way to Having more a Coronavirus Outbreak; Worse than China's or Even Italy's. Business Insider (March 26, 2020. https://www.businessinsider.com/figures-show-us-soon-coronavirus-worse-than-china-2020-3. The number of confirmed cases continues to rise exponentially, but reported numbers underrepresent the true scope of the crisis -- "experts believe that the United States still isn't testing enough people to detect the outbreak's true spread." Alexis C. Madrigal & Robinson Meyer, How the Coronavirus Became an American Catastrophe,

---

[2] See also Nick Wilson et al., Case-Fatality Risk Estimates for COVID-19 Calculated by Using a Lag Time for Fatality, 26(6) EID Journal (prepublication June 2020), https:wwwnc.cdc.gov/eid/article/26/6/30-2020 article.

The Atlantic, (Mar 21, 2020)(estimating that the virus has already infected 87,000 Americans as of that date), http://www/theatlantic.com/health/archive/2020/03/how-many-americans-are-sick-lost-february/608521/.

The severity of the coronavirus pandemic is reflected in the actions of local and national leaders, who have taken drastic measures to prevent the spread of the disease.  All 50 states and the national government have declared states of emergency and just recently have started to re-open. See Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak. (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.  Kamran Rahman & Alice Miranda Ollstein, How States Are Responding to Coronavirus, in 7 Maps, Politico, (Mar. 24, 2020), https:www.politico.com/news/2020/03/24/coronavirus-state-response-maps-146144.  Additionally, more than half of the states and the District of Columbia have imposed severe restrictions for their citizens, limiting what businesses can be open and how many customers they may have at one time.

Conditions of imprisonment create the ideal environment for the transmission of contagious disease.  Joseph A. Bick, Infection Control in Jails and Prisons, 45 Clininical Infectious Diseases, 1047-1055, (Oct. 2007) https//doi/org.1086/521910. "Incarcerated/detained persons live, eat, work, study and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced."  Centers of Disease Control & Prevention (CDC), Interim Guidance on Management of Coronavirus Disease 2019 (COVID) in Correctional and Detention Facilities (Mar. 23, 2020), https:www.cdc.gov./coronvirus/2019-ncov/community/correctional-detention/guidance-correctional-detentin.html.  Refer also to refer to the current case in Ohio's Northern District involving FCI Elkton.  The CDC recognizes the difficulty of preventing the introduction of COVID into prison facilities:

There are many opportunities for COVID-19 to be introduced into a correctional
or detention facility, including daily staff ingress and egress; transfer
of incarcerated/detained person between facilities and systems, to
court appearances, and to outside medical visits; and visits from family,
legal representatives, and other community members.  Some settings,
particularly jails and detention centers, have high turnover, admitting
new entrants daily who may have been exposed to COVID-19 in the surrounding
community or other regions.

Id.

Crowding, inadequate ventilation, and security issues all contribute to

the spread of infectious disease in jails and prisons.  Michael Kaste, Prisons

an Jails Worry About Becoming Coronavirua 'Incubators', NPR  (Mar. 13, 2020),

https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-

coronavirus-incubators.    Hand  **sanitizer** an effective disinfectant recommended

by the CDC to reduce transmission rates, is contraband in jails and prisons

because of its alcohol content.  Keri Blakinger & Beth Schwarzapfel, How Can

Prisons Contain Coronavirus When Purell is a Contraband?,  ABA Journal (Mar.

13, 2020), https://www.abajournal.com/news/article/when-purell-is-contraband-

how-can prisons-contain-coronavirus.  Additionally, incarcerated people tend

to be in poorer health than the general population.  According to a recent

Bureau of Justice Statistics study, approximately half of state and federal

prisoners and jail inmates have chronic conditions such as cancer, high-blood

pressure, diabetes, cirrhosis of the liver, heart disease, and asthma.  Laura

M. Maruschak et al., Medical Problems of State and Federal Prisoners and

Jail Inmates, NCJ 248491  (2015), https://www.bjs.gov/content/pub/pdf/mpsfpj

1112.pdf .  Medical care of prisoners is limited at the best of times.[3]

Because of these dangers, the public health community is insistent on

the critical need to rapidly  reduce our prison populations for the health

of our inmates and the health of the community as a whole.

[3]See U.S. Dep't of Justice Office of the Inspector General, Review of
the Federal Bureau of Prisons' Medical Staffing Challenges (Mar. 2016)
https://oig.justice.gov/reports.2016/e1602.pdf (finding that the BOP experienced
chronic medical staff shortages and failed to take adequate measures to address
them, leading to problems meeting the medical needs of prisoners, requiring

> It is ...an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible.... Releasing as many inmates as possible is important to protect the health of inmates, the health of the correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole.

Breyer Declaration, ¶¶ 17, 19. "We need to take the unprecedented step TODAY of providing urgent release to everyone in the jails who is at risk of serious morbidity and mortality from COVID." Jennifer Gonnerman, A Riker Island Doctor Speaks Out to Save Her Elder Patients from the Coronavirus, The New Yorker (Mar. 20, 2020) (quoting Rachel Bedard, Rikers Island Geriatrican).

Similarly, on March 23, 2020, a bipartisan group of fourteen senators wrote to Attorney General Barr and the Director of Prisons to express "serious concern for the health and wellbeing" of those inmates "most vulnerable to infection." Letter from Senator Charles Grassley et al. (Mar. 23, 2020). They noted that "[c]onditions of confinement do not afford individuals the opportunity to take proactive steps to protect themselves, and prisons often create the ideal environment for the transmission of contagious disease." Id. The senators called on the BOP to use existing tools like the elderly prisoner home confinement program and compassionate release to release vulnerable inamtes from prison. Id. (Attachment    )

COVID-19 has made in roads in the BOP, reaching at least 106 locations and infecting staff and inmates to the extent that 4,500 inmates and 500 staff are affected. The BOP is performing limited testing, but of the 41,000 tested they have test nearly 26% have tested positive. There are 105 inmates dead,

---

the use of outside hospital, and endangering the safety and security of the institutions); U.S. Dep't of Justice Office of the Inspector General, The Impact of Aging Inmate Population on the Federal Bureau of Prisons (Rev. Feb 2016), https:oig.justice.gov/reports/2015/e1505.pdf (finding that BOP facilities and services, including medical services, were inadequate to meet the needs of an aging population leading to delays in medical treatment for prisoners with acute and chronic heart and neurological conditions, who wait an average of 114 days to see medical specialists); David Patton, Statement from Federal Defenders of New York, Federal Defenders of New York, (Mar. 8, 2020), https://federaldefendersny.org/about-us/news/statement-from-federal-defenders-of-new-york.html.

as May 24, 2020.  www.bop.gov/coronavirus (providing daily tallies of confirmed

infections.  As the judge in United States v. Caddo noted, "it is unknowable

whether BOP detainees or inmates have COVID-19 until they are tested, and BOP

has not conducted many tests, because like the rest of the country BOP has

few tests.  Order at 5 United States v. Caddo, No.3:18-cr-08431-JJT (D. Ariz.

Mar. 23, 2020).  One BOP inmate who fell ill on March 19,2020, from FCI Okaldale

another was pregnant at FMC Carswell who dies giving birth to her daughter.

The warden of FCI Oakdale has been removed from his position as of May 24,

2020.

   3. Mr. **Thomas**            Runs a High Risk of Serious Illness or Death
      if he Contracts COVID-19.

The CDC and other medical authorities have made clear that COVID-19

is especially dangerous for both older people and people with severe chronic

medical conditions.  See https://www.cdcgov/coronavirus/2019-ncov/specific-groups/

high-risk-complications/older-adults.html. Eight out of ten deaths reported

in the United States have been older adults. Id.  Those with certain serious

health concerns—including chronic lung disease, moderate to severe asthma,

compromised immune systems, severe obesity, diabetes, renal failure, and

liver disease—are also especially vulnerable to and at high risk for serious

complications from COVID-19, including death.  See https://www.cdc.gov/coronavirus/

2019-ncov/hcp/underlying-conditions.html.

   Mr. **Thomas**                 As such, he is among those with the

highest risk of death or serious illness from COVID-19.  Yet, as a Bureau

of Prisons inmate, it is impossible for Mr. **Thomas**       to follow the CDC's

recommendations to protect himself from exposure to this highly-transmissiable

disease.  this risk of serious illness or death from the unprecedented global

pandemic, together with all of the other relevant factors in this case, presents

an extraordinary and compelling basis for sentence reduction.

**C.  Courts Responding to the Coronavirus Pandemic Have Reconized the Critical Importance of Reducing Incarcerated Populations**

The Court response to COVID-19 reflects the extreme exigency of the present circumstances, especially for those individuals most vulnerable to harm form the virus.  In United States v. Garlock, for example, the district court extended the defendant's date of surrendering to serve an already-imposed prison sentence until September 1, 2020, concluding that no one should be entering the BOP custody absent "truly extraordinary circumstances";

> By now it almost goes without saying that we should not be adding to
> the prison system population during the COVID-19 pandemic if it can be
> avoided.  Several recent court rulings have explained the health risks—
> to inmates, guards, and the community at large—created by large prison
> populations....The chaos has already begun inside federal prisons—inmates
> and prison employees are starting to test positive for the virus, quarantines
> are being instituted, visits from outsiders have been suspended, and
> inmate movement is being restricted even more than usual....  To avoid
> adding to the chaos and creating unnecessary health risks, offenders
> who are on release and scheduled to surrender to the Bureau of Prisons
> in the coming months should, absent truly extraordinary circumstances,
> have their surrender dates extended until this public health crisis has
> passed.

No. 3:18-cr-00418-VC (N.D. Cal. Mar. 25, 2020)(CR41).

In United States v. Copeland, No. 2:05-cr-00135-DCN (D.S.C. Mar. 2020), the Court granted a sentence reduction to time served under another portion of the First Step Act to a defendant serving a life sentence for a drug trafficking conspiracy and firearm possession.  The court recognized that the defendant's "tenuous health condition" put him at "even higher risk for severe illness and possible death" from the COVID-19 pandemic.  The court considered letters from members of Congress as evidence of its "desire for courts to 'use all available powers and authorities... to reduce the number of federal prisoner  in prisons.'" especially for elderly and sick individuals and those within the last 36 months of their sentences who are appropriate for placement in home confinement. Id. at **(quoting Letter of House Judiciary Committee, Mar. 19, 0220).

Similarly, in Toldeo Manrique, the district court granted bail in an extradition matter, although the individual faced a life sentence in Peru. 2020 WL 1307109, at *1. Noting the Toledo Manrique is 74 years old, the Court concluded, "[t]he risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."Id. The court rejected the goernment's argument to delay consideration "until there is a confirmed outbreak of COVID-19" in the pretrial detention facility, saying: "By then it may be too late."id.

A sampling of the court orders granting release based on the pandemic fails to convey the full volume of building precedent. See, e.g. United States v. Kennedy, No. 18-20315, 2020 WL 1493481 (E.D. Mich. Mar. 27, 2020)("[T]he danger posed to Defendant in the Saginaw County Jail by the COVID-19 pandemic constitutes an independent compelling reason to temporarily release him from custody."); United States v. Copeleand, No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020)(granting First Step Act release to defendant is part dueto "Congress's desire for court to release individuals is, with the ailments that defendant has during this current pandemic"); United States v Michaels, 8:16-cr-76-JVS (C.D. Cal. Mar. 26, 2020)("Michaels has demonstrated that the COVID-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under $3142(i)); United States v. Jaffee, No. 19-cr-88-D.D.C. Mar. 26, 2020)(releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is ... convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement on .... strict conditions."); United States v. Perez, No.19 CR. 297(PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020)(releasing defendant due to the "heightened risk of dangerous complications should he contract

COVID-19"); United States v. Stephens, 2020 WL 129155, __F. Supp. 3d __ (S.D.N.Y.
Mar. 19, 2020)(releasing defendant in light of "the unprecedented and extraordinary
dangerous nature of the COVID-19 pandemic"); Request to Commute or SUspend
County Jail Sentences, Docket No. 084230 (N.J. Mar. 22, 2020)(releasing large
class of defendants serving time in county jail "in light of the Public Health
Emergency" caused by COVID-19).

### D. With Full Consideration of the §3553(a) Factors, Including the COVID-19 Pandemic, Mr. Thomas's Time Served Constitutes a Sentence Sufficient, but Not Greater than Necessary, to Accomplish the Goals of Sentencing.

When extraordinary and compelling reasons are established, the Court
must consider the relevant sentencing factors in §3553(a) to determine whether
a sentence reduction is warranted. 18 U.S.C. §3582(c)(1)(A)(i). Under all
of the circumstances in this case, the Court should conclude that the time
that Mr. Thomas has already served is sufficient to satisfy the
purposes of the sentencing. Under Pepper v. United States, 562 U.S. 476,
490-93 (2011), the Court can, and indeed must, consider post-offense developments
under §3553(a).

Here, the overriding factor under §3553(a) that was not present at the
time of sentencing is the COVID-19 pandemic and the serious risk is presents.
Although the circumstances of the present offense quallfied Mr. Thomas
for the serious sentence that this Court originally imposed, the sentencing
purpose of just punishment does not warrant a sentence that includes exposure
to a life-threatening illness. In fact, the Eight Amendment's prohibition
on cruel and unusual punishment includes unreasonable exposure to dangerous
conditions in custody. Helling v. McKinney, 509 U.S. 25,28(1993); see also
Wallis v. Baldwin, 70 F.3d 1074 (9th Cir. 1995)(applying Helling to exposure
to asbestos); Brown v. Mitchell, 327 F. Supp. 2d 615 650 (E.D. Va July 28,
2004)(applying Helling to "contagious disease caused by overcrowding conditions").
The §3553(a) factors can be met in this case by an order of home confinement

as a condition of supervised release.

Additionally, Mr. Thomas's      conduct while in prison, establishes that the purposes of punishment have been met and that his release would not present any risk to the safety of the community. Under Pepper, the Court must also consider "the most up-to-date picture" of the defendant's history and characteristics, which "sheds light on the likelihood that Mr. will engage in future criminal conduct." Id. 492.

The totality of the circumstances demonstrates that reducing Mr. Thomas's sentence to time served after 7-12 months in custody, the equivalent to 12-18 months of a federal sentence, is "sufficient, but not greater than necessary," to serve the purposes of sentencing under §3553(a).

Mr. Thomas's release plan if released from FCI Englewood to live with his wife of over 16 years with their 10 year old son, in Aurora, Colorado. THis is the same residence he had suring his pre-trial release. It will provide a base of support and a secure location to reintegrate in to society. It is just 15 miles from Englewood. Using his newly acquired skills at the electrical shop he plans to go back to work with Live Broadcast Freelance work that he had prior to being incarcerated. Some of his past employers are Game Creek Video, NEP Broadcasting. There are several vehicles at his disposal to get to and from work and attend his regular meetings of SAA. He has strong financial support access to his 401K funds and has maintained a savings account since entering prison. He plans on attending the required SAA meetings and other counseling for self and with his family as required, as well as all release requirements/registration requirements for city, county and state.

**Conclusion**

For the foregoing reasons, Mr. Joel Thomas, respectfully requests that the Court grant reduction in sentence to time served.

Respectfully submitted this _____ day of _____, 2020.

_____

JOEL THOMAS
Reg No.45461-013

ENG 1330.18b
March 9, 2016
Attachment A, Page 1
Page 9

## FCI   Englewood, Colorado -   Informal Resolution Attempt

DATE INFORMAL RESOLUTION PROCESS COMMENCES: 06MAY2020          1086hrs

INMATE: Joel Thomas

UNIT: W/U 710          REG. NO.: 45461-013

DATE OF THE INCIDENT AND THE NATURE OF THAT COMPLAINT: 14 Apr 2020
In response, the B.O.P. is seeing a surge in COVID19 cases (24,500% increase in cases and over 1400 deaths within the Federal BOP between 3/20/2020 - 4/14/2020) In response the BOP is releasing certain inmates who qualify for Compassionate Release. This requires the inmate show "extraordinary and compelling reasons" for their release. I'm requesting for a Compassionate Release to be put on home confinement per the DOJ and BOP recommendations.

WHAT STEPS DID YOU TAKE TO RESOLVE THIS ISSUED BEFORE BRINGING IT TO THE ATTENTION OF YOUR UNIT TEAM? Request to be released due to the Covid19 outbreak and the overwhelming high risk I'm put in with such over crowding, lack of distancing, int threat to outbreak at any time. To date, there has been no formal testing for inmates and lack of communication from Department Staff.

WHAT ARE YOU REQUESTING TO RESOLVE THIS ISSUE? I'm petitioning the Warden for relief due to the vulnerablenbility of the COVID19 outbreak, to protect myself from possible death. The release to home confinement would decrease my exposure to some 200+ inmates on a daily basis to my wife and son where I can be limited to this people and my chances of getting COVID19 decrease dramatically. All while being monitored in the same fashion by GPS by the BOP. I'm in fear for my life due to the possible outbreak within their over crowded walls. Thank you for this consideration.

INMATE SIGNATURE VERIFYING COMPLAINT:
(CONTINUED REVERSE SIDE)

ENG 1330.18b
March 9, 2016
Attachment A, Page 2
Page 10

COUNSELOR'S COMMENTS: Unable to resolve

_____

DEPARTMENT HEAD'S COMMENTS TO INMATE AFTER REVIEW OF THE COUNSELOR'S COMMENTS:

_____

DEPARTMENT HEAD SIGNATURE:_____ DATE: _____

UNIT MANAGER'S SIGNATURE:_____ DATE: _____

|  | BP-8 Issued | BP-8 Returned | BP-9 Issued | BP-9 Returned | BP-9 Rec'd in Admin. Remedy Clerk |
|---|---|---|---|---|---|
| Date | 5/6/20 | | | | |
| Time | 10:20am | | | | |
| Counselor | K. Morgan | | | | |

Completion of all sections of this form is required before a BP-229(13) can be issued. This form supersedes all previous forms.

UNITED STATES OF AMERICA vs. SCOTT GINSBERG
UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN
DIVISION
2020 U.S. Dist. LEXIS 84907
Case No. 14 CR 462
May 14, 2020, Decided
May 14, 2020, Filed

**Editorial Information: Prior History**

United States v. Ginsberg, 2018 U.S. Dist. LEXIS 187621 (N.D. Ill., Nov. 2, 2018)

**Counsel**    {2020 U.S. LEXIS 1}For Scott Ginsberg, Defendant: **Alan Ellis**, LEAD ATTORNEY, Law Offices of **Alan Ellis**, Novato, CA; Jonathan I. Edelstein, PRO HAC VICE, Law Offices of **Alan Ellis**, New York, NY; Marcos E Esparza, Law Office of Marcos Esparza, Chicago, IL.

For USA, Plaintiff: Rick D. Young, LEAD ATTORNEY, United States Attorney's Office (NDIL), Chicago, IL; Chicago, United States Attorney's Office (NDIL - Chicago), Chicago, IL; Pretrial Services; Probation Department; Andrew S. Boutros, Seyfarth Shaw LLP, Chicago, IL.

**Judges:** MATTHEW F. KENNELLY, United States District Judge.

**Opinion**

**Opinion by:**    MATTHEW F. KENNELLY

**Opinion**

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, as Emergency Judge:

In 2007, Scott Ginsberg committed a series of very serious financial crimes. Acting, or at least claiming to act, as a real estate investor, he made a deal with the owners of an apartment complex to be paid "incentive payments" if he could find buyers to purchase multiple units. Ginsberg then recruited "buyers" with good credit and told them they could buy multiple units with no money down, rent them out, and then sell them at a profit, and that he would pay them as much as $10,000 for each purchase. Ginsberg then arranged financing for these straw purchasers,{2020 U.S. Dist. LEXIS 2} all the while concealing his arrangements with the owners and with the purchaser. He also submitted loan applications for the buyers that included multiple misrepresentations and significant omissions. If the lenders had known the truth, they would not have made loans at all, nor would they have loaned money based on the full purchase price had they known a significant part of the proceeds was going to Ginsberg rather than to the seller. Ginsberg's fraud was both well-planned and extensive. He was paid consulting fees of around $1.2 million, and when the loans went into default-as all thirty-two of them did-the lenders collectively lost over $3 million.

Ginsberg was charged with bank fraud in 2014. This was a full seven years after he carried out his

DISHOT    1

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

scheme. He pled guilty in 2018. Ginsberg, who at the time of his sentencing was fifty-five years old, had no record of prior convictions. He is married and the father of six children currently ranging in age from twenty to eleven. The advisory range under the Sentencing Guidelines was fifty-seven to seventy-one months imprisonment. The sentencing judge imposed a carefully-considered and well-explained sentence of thirty months imprisonment,{2020 U.S. Dist. LEXIS 3} about half of the low end of the advisory range. The judge justified the below-range sentence on a number of bases including, as set out in the judgment and commitment order, the "length of time between [the] offense conduct and [the] date of conviction."

Ginsberg reported to prison on or about June 10, 2019, a little over eleven months ago (he received an unopposed extension of his originally-set surrender date). He has now filed an emergency motion for early release under 18 U.S.C. § 3582(c)(1)(A). He cites his medical conditions and his age (now just short of fifty-seven) and the risks posed by the coronavirus.

Ginsberg's motion is made under section 603(b) of the First Step Act, which amended 18 U.S.C. § 3582(c)(1)(A) to provide a greater role for courts in determining whether to reduce a defendant's sentence based on "extraordinary and compelling reasons" warranting a reduction. As amended, and as applicable here, the statute provides that

> [t]he court may not modify a term of imprisonment once it has been imposed except that-
>
> (1) in any case-
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons{2020 U.S. Dist. LEXIS 4} to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that-
>
> (i) extraordinary and compelling reasons warrant such a reduction;
>
> . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .18 U.S.C. § 3582(c)(1)(A).

The record reflects that on March 31, 2020, Ginsberg sent the warden of FCI Miami, where he is incarcerated, a request to be transferred to home confinement, specifically referencing the First Step Act. *See* dkt. no. 170-4. At some point after that-the record is not completely clear, but it was on or about April 15-Ginsberg resent the same request, having written in the citation of the statute (18 U.S.C. § 3582(c)(1)(A)(i)) and the phrase "CDC high risk criteria for death." *Id.* The government says that as of April 21, the Bureau of Prisons decided to treat the request{2020 U.S. Dist. LEXIS 5} as seeking compassionate release. It seems to argue (though it does not support) that the thirty-day clock *should be considered to have started on that date, not* on March 31 when Ginsberg sent his original request. Assuming the government is actually advancing that point, the Court disagrees. The request that Ginsberg sent on March 31 was sufficient to trigger the thirty-day period contained in the statute. Nothing in the statute, governing caselaw, or common sense requires a *pro se* prisoner to cite chapter and verse in order to satisfy a statutory requirement of this sort. Ginsberg's March 31 request referenced the First Step Act and discussed his medical conditions in great detail. It was more than sufficient to put the warden and the BOP on notice that he was seeking compassionate

DISHOT                                                      2

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

release from prison. And because more than thirty days has now run, Ginsberg has satisfied one of the two alternative statutory prerequisites for seeking relief in court.1

The next question is whether there are "extraordinary and compelling reasons" warranting a reduction. Ginsberg cites the coronavirus outbreak and his age and medical condition, which he contends place him at a significantly greater risk{2020 U.S. Dist. LEXIS 6} of severe injury if he contracts the virus. It appears to be undisputed that Ginsberg has a significant history of cardiac and respiratory disease. These are confirmed risk factors for serious illness if one contracts coronavirus. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 13, 2020). At present, it appears there are no confirmed cases of coronavirus among either staff or incarcerated persons at FCI Miami, where Ginsberg is incarcerated. *See* https://www.bop.gov/coronavirus/index.jsp (last visited May 13, 2020). But the Court has no information about how much, if any, testing has been done among inmates at the prison. Thus the fact that there are no confirmed cases does not mean that no one in the prison has contracted coronavirus. If and when that happens, the virus is likely to spread more quickly there than in the general population due to, among other things, the difficulty of accomplishing social distancing in a prison environment and the constant influx of people coming and going from outside the prison, including correctional staff. (This is particularly true in Ginsberg's situation, as it appears he is housed{2020 U.S. Dist. LEXIS 7} in a so-called "dormitory" unit that has several dozen prisoners sleeping in the same room.) And although it appears that the vast majority of those who contract coronavirus do not suffer serious illness, one cannot discount the significant risk to Ginsberg if he contracts coronavirus, given his risk factors. This qualifies as an *extraordinary reason warranting consideration of a reduction of his sentence.*

The next question is whether a reduction "is consistent with applicable policy statements issued by the Sentencing Commission." The policy statements issued by the Sentencing Commission even before the passage of the First Step Act included an open-ended provision broad enough to cover the circumstances argued by Ginsberg. *See* U.S.S.G. § 1B1.13, app. note 1(D). *See, e.g., United States v. Reyes*, No. 04 CR 970, 2020 U.S. Dist. LEXIS 58894, 2020 WL 1663129, at *2 (N.D. Ill. Apr. 3, 2020) (Leinenweber, J.).

Finally, section 3582(c)(1)(A) requires the Court to consider the factors regarding imposition of an appropriate sentence set forth in 18 U.S.C. § 3553(a). These include Ginsberg's history and characteristics; the nature and circumstances of the crimes; due consideration of the seriousness of the crimes; promoting respect for the law; providing just punishment; affording adequate deterrence; protecting the public from further crimes by Ginsberg; and providing him with{2020 U.S. Dist. LEXIS 8} any necessary services and treatment.

Ginsberg's crimes were unquestionably serious, and banks suffered significant losses as a result. Under normal circumstances, he would serve about another twelve months, or perhaps less, in prison. Specifically, Ginsberg's current release date, per the Bureau of Prisons website, is in late July 2021, but were he to serve out his sentence he would actually be released to a residential reentry center at least sixty days before that, possibly more. So in reality he is no more than a year from release from prison.

The reduction that Ginsberg seeks is undeniably significant as compared to his overall sentence, but it is warranted under the circumstances. As the sentencing judge noted in the judgment, a *very* long time passed between Ginsberg's crimes and the return of charges against him. Given the circumstances, his service of nearly a year in prison is sufficient to impose just punishment and deter him and others, and it does not diminish the seriousness of his crimes or undercut respect for the law. This is particularly so because the Court will, as a condition of reducing Ginsberg's prison term,

DISHOT                                          3

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

add a supervised release condition of six months home{2020 U.S. Dist. LEXIS 9} detention with location monitoring. In other words, Ginsberg's liberty will continue to be restricted in a significant way for the next six months.

None of what the Court has said should be understood to suggest any disagreement with the sentence imposed by the sentencing judge. That sentence, as the Court has stated, was carefully thought out and meticulously justified. But circumstances have changed in a material and unanticipated way. At this point, given Ginsberg's significant prior medical conditions and the risk he faces if exposed to the coronavirus, a reduction of his sentence is justified.

**Conclusion**

For the reasons stated, the Court grants defendant Scott Ginsberg's emergency motion for release under 18 U.S.C. § 3582 [dkt. no. 170] and reduces the defendant's prison sentence to time served. This is conditioned, however, upon a modification of the terms of his supervised release to add a requirement that the defendant serve the first six months of his release on home detention.2 Compliance with this condition shall be monitored by a form of location monitoring technology selected at the discretion of the probation officer, and Ginsberg shall abide by all technology requirements. The Clerk will{2020 U.S. Dist. LEXIS 10} prepare an amended judgment and commitment order.

Date: May 14, 2020

/s/ Matthew F. Kennelly

MATTHEW F. KENNELLY

United States District Judge

### Footnotes

1

The Court notes that later submissions from the parties, requested by the Court, advise that Ginsberg's request for an early release has been approved by the warden at FCI Miami, but there are evidently several layers of BOP review that remain. Given the circumstances, the Court is unpersuaded that it should wait for this process to play out, and the statute does not require this-rather, it simply require passage of thirty days after the detainee makes a request to the warden.
2

The Court imposes this condition in order to facilitate Hansen's reentry to the community.

DISHOT                                          4

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

JOEL THOMAS ..........
45461 O13
FCI ENGLEWOOD
9595 W QUINCY AVE
LITTLETON CO
80123

HON. CHRISTINE ARGUELLO
ALFRED A ARRAJ COURT HOUSE
901 19TH STREET
DENVER CO
80294

RETURN RECEIPT
REQUESTED

7020 1290 0000 2667 2785

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS • FOLD AT DOTTED LINE

CERTIFIED MAIL®



1023



80294



U.S. POSTAGE PAID
FCM LG ENV
PARKER, CO
80134
AUG 20 20
AMOUNT
$8.20
R2304E107198-16