IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 19-cr-00397-CMA

UNITED STATES OF AMERICA,

      Plaintiff,

v.

JOEL THOMAS,

      Defendant.

---

**GOVERNMENT'S RESPONSE TO DEFENDANT'S AMENDED MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

---

The United States of America, by and through Jason R. Dunn, United States Attorney for the District of Colorado, and Alecia L. Riewerts, Assistant United States Attorney, hereby submits the following response in opposition to defendant Joel Thomas's "Amended Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i)" [ECF #41] ("Def. Mot."). In his motion, the defendant requests that the Court "order a reduction in sentence to time served." *Id.* at 4.

The Bureau of Prisons ("BOP") and FCI Englewood have taken great steps to prevent the introduction of COVID-19 into the defendant's institution. There are no inmates at the institution who are currently COVID-19 positive as of the date of the filing of this response. The defendant has failed to show "extraordinary and compelling" reasons to justify such extraordinary relief and he has failed to show that a time served sentence would achieve the goals of sentencing as articulated in 18 U.S.C. § 3553. Therefore, the defendant's motion for compassionate release should be denied.

BACKGROUND

Between May 2012 and August 2013, the defendant was anonymously registered on two different websites that operated on Tor, a network designed and used for the purpose of facilitating anonymous communication over the Internet. The primary purpose of both websites (known as "Website 15" and "Website 18") was to advertise and distribute child pornography. Further, the rules for at least Website 15 dictated that users had to continuously share or they would lose access to the website. The defendant was an active contributor and consumer on both sites.

On Website 18, the defendant made a total of 54 posts in a period of less than a year. Plea Agreement [ECF #19] ("PA") at 17-18. Some of the posts included hyperlinks to external websites where the file was no longer accessible by the time law enforcement seized the websites, but the language of the posts made clear that the defendant was both sharing links to child pornography and requesting particular files to be sent in return. *Id.* at 18. For example, on December 6, 2012, the defendant included a hyperlink to a file-sharing site on Tor and stated, "Looking for this set, or name of the set so I can get it myself. Thanks for the help friends!!!!". On November 8, 2012, the defendant posted a hyperlink to an outside site, along with a password and stated, "Here is a cutie!!!!". *Id.*

On Website 15, over approximately fourteen months, the defendant made a total of 119 postings with 78 attachments, and sent or received 39 private messages. *Id.* at 15-16. His postings discussed his extensive collection of child sexual exploitation material, shared specific child pornography from his collection with the other

approximately 215 users, and requested particular child pornography files to add to his collection, sometimes requesting images of a distinct minor victim.  *Id.* at 12, 16-17.

Users of Website 15, including the defendant, would often thank each other for the material posted and callously discuss the trading of depictions of child sexual exploitation like some might discuss the trading of their favorite baseball cards.  For example, on June 10, 2012, the defendant made a post stating, "Hey everyone...I was going thru my collection and decided it needed to be re-organized... How do you keep your files organized...for instance, I have a folder of To Sort, Cream Pie, Boys, PTHC[1], SCCP, Stories, Pics, etc...now some of my folders are getting dis-organized, such as To Sort and Pics...How do you sort yours...do you go as deep as date, age, year, etc...Let us know and maybe we can be more efficient on what is requested and posted....Thanks."  Attached to the post was one image depicting a nude prepubescent female who was sitting on her knees with her legs spread apart, partially exposing her vagina.  *Id.* at 16.

The defendant had been collecting child pornography for a lengthy period of time. On June 4, 2012, the defendant made a post stating, among other things, "Hey Forum, A little about me, I've been collecting since the 90's, however, I had to destroy three drives in the past and re-build my collection due to fear and paranoia, however, with the true crypt and the size of drives, I can have my entire collection on one device now…..My favorite sets are the YVM, LSM 1st studio, webcam of girls 9-14, and of course the classics".  *Id.* at 16.  In fact, the defendant continued to engage in his

---

[1] PTHC stands for "pre-teen hard core", indicating that the child pornography depicts a prepubescent minor is engaged in one or more sex acts with one or more other minors or adults.

criminal activity after the police first came to his home in 2010 and even after he had a child of his own.  Presentence Investigation Report [ECF #25] ("PSR") at ¶¶29, 62.

It was clear based on the forensic examination that the defendant had taken steps to avoid law enforcement detection, including encrypting his laptop.  The forensic examination of the defendant's laptop, which had been used to access the websites described above, revealed two significantly sized encrypted containers, totaling approximately 40 gigabytes, which the forensic examiner was unable to open.  PA at 20-21.  Also, a commercial product permitting the secure deletion of files and removal of remnant data was installed and all cleaning features were enabled.  PA at 20.

Defendant pled guilty to an Information charging him with Access with Intent to View Child Pornography, in violation of 18 U.S.C. §2252A(a)(5)(B).  PSR at ¶1.  The Court sentenced him to 48 months' imprisonment.  Judgment [ECF #33] at 2.  His sentence includes five years of supervised release with conditions.  *Id.* at 3-5.

MOTION

Defendant filed a *pro se* motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) on August 24, 2020.  ECF #38.  Counsel was appointed to represent the defendant on August 5, 2020.  ECF #39.  The Court directed defense counsel to file any supplement to the defendant's *pro se* motion by September 4, 2020, and directed the government and Probation to file a response seven days thereafter.  ECF #40.

In his amended motion, the defendant asserts that the defendant is "among those who are at the highest risk of death or serious illness if he is exposed to the disease."  Def. Mot. at 1.  He argues that he is at increased risk of complications from

COVID-19 due to his age, his medical history, and his family medical history.  *Id.* at 1-5.

The defendant asks to be sentenced to time served.  *Id.* at 5.

<u>BUREAU OF PRISON'S AND FCI ENGLEWOOD'S RESPONSE TO COVID-19</u>

In response to the pandemic, BOP has taken aggressive steps to protect inmates' health and to keep COVID-19 out of its facilities. "[M]aintaining safety and security of BOP institutions is [BOP's] highest priority."[2]  The Bureau of Prisons is currently housing the defendant at FCI Englewood, here in Colorado.  As of today, there are 0 positive cases of COVID-19 at FCI Englewood and 7 inmates recovered. *See* https://www.bop.gov/coronavirus/ (last accessed September 11, 2020).  In addition to BOP-wide protocols, FCI Englewood has taken measures to ensure inmate safety.  As of Thursday, August 6, 2020, the following steps were in place at FCI Englewood to protect inmates at BOP from the COVID-19 virus:

A.    FCI Englewood Command Center

1.    On March 13, 2020, FCI Englewood activated its local Command Center. The local Command Center, in conjunction with the National Command Center, monitors, plans, and implements national directives and other procedures at FCI Englewood.

2.    In addition to the special rules limiting inmate movement discussed above, FCI Englewood has taken many other steps to prevent the introduction and spread of COVID-19.  Those steps include providing inmate and staff education, conducting inmate and staff screening, implementing testing, quarantine, and isolation procedures, and ordering enhanced cleaning, testing, and medical supplies, among other preventative measures.

B.    Inmate and Staff Education relating to COVID-19

1.    From the outset of the COVID-19 pandemic, FCI Englewood officials have provided regular updates to inmates and staff regarding the virus and the

---

[2] Updates to BOP COVID-19 Action Plan: Inmate Movement (March 19, 2020), *available at* https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited September 11, 2020).

Bureau's response to the situation.  The officials have educated inmates and staff regarding measures that they themselves should take to stay healthy.

2. The Executive Staff—including the Warden, Associate Warden, and Captain—conduct town hall meetings, weekly rounds and/or disseminate inmate bulletins.  During these times, inmates receive instruction about all aspects of COVID-19, including how to identify symptoms, how to prevent the virus from spreading (including through good personal hygiene), and the need to immediately report symptoms to medical providers. Informational handouts are posted in locations throughout FCI Englewood, including in inmate housing units and in places where they can be easily seen by institution staff. Inmates also receive this information by means of information bulletins posted on TRULINCS, in both English and Spanish.

3. FCI Englewood staff have also been educated about how to prevent the introduction and spread of COVID-19, including the importance of frequent hand washing, not touching their face, maintaining appropriate social distancing, and cleaning and disinfecting all equipment, including their uniforms. Additional hand sanitizer stations have been placed for their use.

C. Screening for COVID-19 at FCI Englewood

The following screening measures for both inmates and staff are currently in place and will remain in effect even after the stay-in-shelter order is lifted, until Bureau officials have made a determination that COVID-19 no longer poses a threat.

1. Inmates

    i. FCI Englewood began screening incoming inmates for COVID-19 on March 19, 2020.  All newly arriving inmates to FCI Englewood are screened immediately upon their arrival.  All inmates are medically screened by the Health Services Department.  The medical providers conduct an initial screening in a designated area at FCI Englewood separate from other staff and inmates.  The medical providers wear personal protective equipment, or "PPE," during the screening process. All inmates designated and arriving to FCI/FPC/FDC Englewood are tested for COVID-19, and placed in quarantine for 14 days.  Around the 14th day, the inmates are retested, and are not released from quarantine until the results of the second test is received.

    ii. The inmate is evaluated for symptoms of COVID-19 (including fever, cough, and shortness of breath), as well as for "exposure risk factors," including whether the inmate has traveled from, or through, any locations identified by the CDC as increasing epidemiologic risk within the past 14

days, or has had close contact with anyone diagnosed with COVID-19 in the past 14 days.

iii.  Following this initial screening, the inmate is escorted to the unit in the prison that has been designated as the isolation/quarantine unit, where all inmates and staff are required to wear a surgical mask and all medical staff members must wear PPE.

iv.  If the inmate does not have symptoms or risk factors, he is tested for COVID-19, and quarantined for 14 days.  During this period, he is checked twice daily for signs, symptoms, and temperature, to ensure he does not develop any symptoms consistent with COVID-19.  If the inmate does have symptoms or risk factors, or if he has a pending COVID-19 test, he will be placed in an isolation cell.  In all areas of the quarantine/isolation unit, all staff must wear PPE and all inmates must wear a surgical mask. Inmates on quarantine and isolation status are not celled together.  Their cells are in the same physical plant, though the air handlers have been adjusted to reduce the risk of air transfer between adjacent cells

v.  After the expiration of 14 days, and upon medical clearance, inmates are released into the general population.

vi.  This process ensures inmates are screened in a controlled environment, so the rest of the inmate population is not exposed to a newly arrived inmate until he has been properly screened and cleared by Health Services Department medical providers.

vii.  FCI Englewood has also taken steps to screen its current resident inmate population.

viii.  The Health Services Department follows current CDC guidance in caring for individuals at FCI Englewood who are considered "high risk." These guidelines can be found at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.  Per CDC guidance, "high-risk" individuals include those over 65 and those with significant underlying medical conditions, such as chronic lung disease, moderate to severe asthma, liver disease, and diabetes.  *Id.*

ix.  FCI Englewood is also conducting enhanced screening for all inmates with ongoing work details, such as food service and cleaning orderlies, deemed essential functions.  Each inmate orderly is screened for illness before and after each assigned work detail, including screening for symptoms and having their temperature taken.  As a further precaution, most cleaning orderlies are assigned only to the units in which they reside, thus limiting their contact with inmates in other housing units.

x.  All inmates are encouraged to self-monitor and to report symptoms of illness to FCI Englewood staff.  Inmates have multiple opportunities, every day, to speak with medical providers.  The Health Services Department is staffed with a full complement of medical providers who go to each housing unit at least twice every day to conduct sick call and pill line.  In addition, unit staff and other department representatives (including staff from education, commissary, psychology, and recreation) are required to conduct regular rounds in each housing unit to ensure the inmate population remains safe and healthy.  An inmate can speak with any of these staff members, or bring concerns to staff's attention by means of a written request, or "cop-out".

xi.  FCI Englewood Health Service's medical providers are prioritizing immediate medical care for anyone who claims symptoms indicative of a COVID-19 infection.  An inmate with symptoms consistent with COVID-19 will be evaluated by a medical provider in the Health Services Department. Based upon that evaluation, a determination will be made as to whether isolation and/or testing is appropriate.  If an inmate is deemed appropriate for isolation, the inmates in his housing will be quarantined for a period of the sooner of 14 days or pending results of a COVID-19 test.

xii.  An inmate may also be placed in quarantine or isolation if he is exposed to a person with COVID-19, where he will be tested and monitored daily for a period of at least 14 days.  Quarantine or isolation will only be discontinued upon receiving negative results from the second COVID-19 test around the 14th day of isolation or quarantine and contingent upon the inmate not developing new symptoms.

xiii.  If there is a positive inmate case of COVID-19 at FCI Englewood that inmate will be placed in an isolation cell and be screened daily by Health Services for symptoms and appropriate care.

xiv.  All inmates have access to sinks, water, and soap at all times.  Newly arriving, and currently housed inmates at the FCI/FDC/FPC Englewood automatically receive soap, and all inmates may receive new soap weekly. For inmates without sufficient funds to purchase soap in the commissary, soap and other hygiene items are provided at no cost to the inmate.  FCI Englewood inmates' clothing and linens are sent to be washed twice weekly.

xv.  All common areas in inmate housing units are cleaned at least once daily, and are typically cleaned by inmate orderlies multiple times throughout the day, with a designated disinfectant known to kill human coronavirus.  FCI Englewood has made this disinfectant available to all inmates so that they may clean their own living areas on a regular basis.  Common areas outside inmate living areas, including the FCI Englewood lobby,

bathrooms, cafeteria, etc., are also cleaned with the same disinfectant on a daily basis, and often multiple times per day.

xvi. Each housing unit has been stocked with cleaning supplies for use by inmate orderlies and other inmates to clean both the common areas and their individual housing areas on a daily basis.

2. Staff and Visitors

i. Since March 19, 2020, all individuals entering FCI Englewood (including staff, delivery drivers, or any other visitors) are directed to a single point of entry. Every person entering the institution must undergo a health screening. The screening consists of a questionnaire to evaluate their risk of exposure, as well as to determine whether they have been experiencing any symptoms of illness, in addition to having their temperature taken.

ii. The persons conducting this health screening are authorized to deny entry to any individual if he or she has a body temperature of 100.4 degrees Fahrenheit or above, or reports other symptoms consistent with COVID-19.

iii. This screening applies to all staff and visitors, including those who leave the grounds of FCI Englewood even for a short duration of time, such as a lunch break.

iv. FCI Englewood employees have also been educated on the importance of staying home if they are feeling ill, and are required to self-report any COVID-19 exposure (known or suspected) as well as any positive COVID-19 test. If a staff member is tested for COVID-19, they are not permitted to return to work until they have received negative test results.

v. FCI Englewood has limited the number of in-person, onsite staff meetings. If such meetings take place, they are limited to 10 people and must be conducted in areas that allow individuals to maintain an appropriate distance from one another.

vi. Correctional staff are required to disinfect all common equipment, such as keys and radios, upon obtaining these items from the supply room and again upon their return. Staff also have regular, consistent access to soap and hand sanitizer.

vii. Correctional staff are provided with protective equipment to be used in appropriate locations throughout FCI Englewood such as quarantined areas, isolation units, and screening sites. FCI Englewood has sufficient PPE on hand, including N-95 respirator masks, surgical masks, and

rubber gloves, to meet its current and anticipated needs.  It has the ability to order additional PPE should the need arise.

viii. On April 6, 2020, all inmates and staff were provided protective face coverings, which are replaced as needed.  New face coverings are provided to inmates releasing to the community.

<u>AUTHORITY</u>

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by

the First Step Act on December 21, 2018, provides in pertinent part:

(c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—

(1)  in any case—

(A)  the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i)  extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general

policy statements regarding the sentencing modification provisions in section

3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and

compelling reasons for sentence reduction, including the criteria to be applied and a list

of specific examples.  Rehabilitation of the defendant alone shall not be considered an

extraordinary and compelling reason."  The relevant policy statement of the Commission

is binding on the Court. *See Dillon v. United States*, 560 U.S. 817, 827 (2010) (where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's policy statements are binding).

The Sentencing Guidelines policy statement appears at U.S.S.G. § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." Critically, in application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:

   (A)   Medical Condition of the Defendant.—

      (i)   The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

      (ii)   The defendant is—

         (I)   suffering from a serious physical or medical condition,
         (II)   suffering from a serious functional or cognitive impairment, or
         (III)   experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)     Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)     Family Circumstances.—

(i)     The death or incapacitation of the caregiver of the defendant's minor child or minor children.
(ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)     Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

For its part, consistent with note 1(D), BOP promulgated "Program Statement 5050.50," available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf (last visited September 11, 2020), to set forth its evaluation criteria.

Program Statement 5050.50 contains standards that are both more extensive than and slightly different from those stated in the Section 1B1.13 policy statement. For instance, the program statement defines a "debilitated medical condition" as one where the inmate is "[c]ompletely disabled, meaning the inmate cannot carry on any self-care and is totally confined to a bed or chair; or [c]apable of only limited self-care and is confined to a bed or chair more than 50% of waking hours." *Id. at 5.*

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *United States v. Heromin*, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019). Compassionate release is "rare" and "extraordinary." *United States*

*v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

ARGUMENT

1. <u>Jurisdiction/Exhaustion</u>

The defendant's motion for compassionate release follows denial of a request for reduction in sentence by the Warden of FCI Englewood on May 18, 2020.  *See* Exhibit 1.[3]  The factors that were evaluated as part of this assessment are reflected in the attached "Reduction in Sentence Review Committee Case Management Worksheet". *See* Exhibit 2.  As of the date of this response, according to the BOP, the defendant has not completed the three formal levels of the BOP Administrative Remedy Program; he has only completed the first level.  *See* https://www.bop.gov/policy/progstat/1330_018.pdf (last visited September 11, 2020).

Noting that the BOP has strict standards for determining whether or not an inmate has complied with the requisite appeal process in making an administrative request for compassionate release and recognizing that the defendant has not met those, the United States concedes that this Court has jurisdiction under 18 U.S.C. § 3582. The Court can consider the defendant's motion for compassionate release because more than 30 days have passed "from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A).

2. <u>Defendant Failed to Present Extraordinary and Compelling Reasons For Release</u>

Defendant fails to assert proper grounds for compassionate release.  As described in his motion, the defendant seeks relief based on COVID-19.  He asserts

---

[3] The government intends to file all exhibits related to this response under restriction.

13

that he is "among those who are at the highest risk of death or serious illness if he is exposed to the disease" due to his age and his medical history.  Def. Mot. at 1.

The defendant is only 40 years old.  *Id.*  According to the Centers for Disease Control and Prevention ("CDC"), "[a]s you get older, your risk for severe illness from COVID-19 increases."  See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited September 11, 2020).  The CDC acknowledges that "people in their 50s are at higher risk for severe illness than people in their 40s. Similarly, people in their 60s or 70s are, in general, at higher risk for severe illness than people in their 50s."  *Id.*  The CDC reports that 8 out of 10 COVID-19-related deaths reported in the United States have been among adults aged 65 years and older and the greatest risk for severe illness from COVID-19 is among those aged 85 or older.  *Id.*  The defendant's age in and of itself clearly does not cause him to fall into a high-risk category.

In terms of medical history, the defendant seeks compassionate release based on Post-Traumatic Stress Disorder, insomnia, depression, and headaches, yet fails to provide any personal medical records in support of his claims that he should be released early.  However, a specific analysis of his medical claims are unnecessary as the defendant has failed to make a *prima facia* showing that he has a debilitating medical condition that would warrant compassionate release. The defendant does not have any documented underlying health issues.  The defendant's Presentence Investigation Report reflects that the defendant represented he was in good health. PSR at ¶67. He also denied a history of mental health issues or treatment in the PSR. *Id.* at ¶68.  The defendant's most recent BOP medical records reflect that he does not

have any current diagnosed medical conditions and is not receiving any prescription medications. *See* Medical Records, Exhibit 3. The defendant has been informed how to seek medical care in the BOP. *Id.* at 4, 16, 27. Further, the defendant's medical records reflect that he did not have any mental health complaints or seek treatment; he was informed how to seek mental health care if needed. *Id.* at 3-4, 6, 16, 27.

Defendant certainly does not assert a medical condition that constitutes a terminal illness or that substantially diminishes his ability to provide self-care within the environment of a correctional facility. He is not 65 years old, experiencing a serious deterioration of his health, and has not served 75% of his sentence. He has not suffered the death or incapacitation of a spouse who was the caregiver to his children. While the government acknowledges the hardships faced by the defendant's wife and minor child and extends its deepest sympathies to them, the defendant must bear responsibility for his actions, which have resulted in his sentence of imprisonment.

The Sentencing Commission recognizes two circumstances related to the medical condition of a defendant. First, the Commission describes an inmate "suffering from a terminal illness (*i.e.*, a serious or advanced illness with an end of life trajectory)." Second, the Commission identifies a circumstance in which "[t]he defendant (I) suffering from a serious physical or medical condition, (II) suffering from a serious functional or cognitive impairment, or (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." Program Statement 5050.50. The common denominator is "a serious physical or medical condition" that "substantially diminishes

the ability of the defendant to provide self-care within a correctional facility."  The defendant has failed to show or even allege that the existence of COVID-19 at FCI Englewood renders him unable to provide self-care.  As such, he has not made showing that "extraordinary and compelling [medical] reasons" exist to justify compassionate release.

Denial of compassionate release in this matter is consistent with the emerging case law following passage of the First Step Act.  Recently, BOP has granted an increased number of requests to file motions for compassionate release.  Courts have denied similar motions when defendants are unable to show extraordinary and compelling reasons.  *See*, *e.g.*, *White v. United States*, 2019 WL 2067223, at *2 (W.D. Mo. May 9, 2019) (petitioner suffers from macular degeneration and knee problems; court held petitioner did not meet his burden to prove that he is currently suffering from a serious medical condition that substantially diminishes his ability to provide for self-care within the prison environment); *United States v. Clark*, 2019 WL 1052020, at *3 (W.D.N.C. Mar. 5, 2019) (defendant suffers from declining health, diabetes, kidney failure, and back problems requiring a walker; court held that she still fell short of the "extraordinary and compelling" standard because she had not demonstrated that her condition substantially diminished her ability to provide self-care within the corrections environment); *see also United States v. Gutierrez*, 2019 U.S. Dist. LEXIS 96796, at *9 (D.N.M. June 10, 2019) (court puts "great weight" on BOP's decision to deny relief).

Even where a defendant is at a facility with confirmed COVID-19 cases, courts have been reluctant to grant compassionate release.  *See United States v. Roberts,* No. 18-CR-528-5 (JMF), 2020 WL 1700032, at *2 (S.D.N.Y. Apr. 8, 2020) (denying to

compassionately release HIV-positive defendant at a facility which had 10 confirmed COVID-19 cases as of the date of the court's opinion); *United States v. Credidio,* No. 19 Cr. 111 (PAE), 2020 WL 1644010, at *1 (S.D.N.Y. Apr. 2, 2020) (noting at least four other inmates had COVID-19, but still declining to release defendant).

Courts also have held that the presence of COVID-19 risk factors do not give rise to extraordinary and compelling reasons justifying compassionate release.[4]  This is true even for defendants residing at facilities with confirmed COVID-19 cases.  For example, in *United States v. Korn*, the court denied the defendant's request for compassionate release notwithstanding the fact that (1) at least 40 COVID-19 cases had already been confirmed at his facility (Butner), and (2) Korn suffers from a serious heart condition that made him more susceptible to COVID-19.  *United States v. Korn*, No. 15-CR-81S & 11—CR-384S, 2020 WL 1808213, at *6-8 (W.D.N.Y. Apr. 9, 2020) (noting court had already considered defendant's medical condition when it imposed his sentence and when it denied his motion for a sentence reduction under 28 U.S.C. § 2255).

In *Korn*, the court held that although "Korn's medical conditions may place him at increased risk of contracting and succumbing to COVID-19 . . . the mere possibility of contracting a communicable disease such as COVID-19, without any showing that [BOP] will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme." *Id.* at *6; *see also*, *e.g.*, *Roberts*, 2020 WL 1700032, at *2 (appropriate relief

_____

[4] A significant portion of BOP's population presumably has one or more of the risk factors identified thus far. *See* Centers for Disease Control, Groups at Higher Risk for Severe Illness, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extraprecautions/groups-at-higher-risk.html  (listing age, lung disease, asthma, heart conditions, severe obesity, diabetes, chronic kidney disease, and liver disease, among others).

for defendant with HIV was a temporary release not compassionate release); *United States v. Hays*, No. 18-00088-KD-N, 2020 WL 1698778 (S.D. Ala. Apr. 7, 2020) (holding concerns about contracting COVID-19 based on defendant's age, medical condition, and allegedly unsanitary conditions at her facility, FCI Aliceville, were not extraordinary and compelling reasons justifying her release).

Here, the 40-year-old defendant presented no medical concerns at the time of his sentencing. His motion fails to substantiate any medical concerns aside from the existence of COVID-19 in his facility. Even if Post-Traumatic Stress Disorder, insomnia, depression, and headaches were substantiated by medical records, they do not qualify as underlying medical conditions that definitively place individuals at increased risk of severe illness of COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited September 11, 2020). The defendant's assertion that the defendant's family "has a history of high blood pressure, heart attacks, and prostate cancer" is also unpersuasive. Def. Mot. at 2. As stated above, compassionate release is for an inmate that "*is suffering* from a serious medical condition." (emphasis added). The plain text of the First Step Act does not provide prospective relief for individuals who *may* be vulnerable to contracting disease, COVID-19 or otherwise. There is nothing in the statute to suggest that having some risk to develop a condition warrants compassionate release.

3.  <u>The 18 U.S.C. § 3553(a) Factors Counsel Against Relief</u>

Even if the Court finds that the defendant has met his burden to prove that an extraordinary and compelling circumstance exists, the defendant's request should be denied, as he does not deserve of a reduction under the 18 U.S.C. § 3553(a) factors, including the nature and circumstances of his offense and his history and characteristics.

The decision to grant or deny a request for reduction in sentence is discretionary. *See Greenholtz* v. *Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979) ("There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence.").  The factors under Section 3553(a) may compel that a defendant's request be denied.  *See*, *e.g.*, *United States* v. *Israel*, 2019 WL 6702522, at *2 (S.D.N.Y. Dec. 9, 2019) (unpublished) (even accepting as true that the defendant was "severely disabled by incurable and progressive medical conditions, and that his condition has worsened substantially since he was originally incarcerated" compassionate release was denied due to the severity of the criminal conduct).

The defendant is 40 years old and as of August 26, 2020 had served 6 months and 23 days, or 16.4%, of his 48 month sentence, assuming he earns the estimated good time of his sentence.  *See* BOP Sentencing Computation, Exhibit 4 at 3.  He has now served approximately 7 months and 6 days of his 48 month sentence.  The BOP projects that his release date is July 2, 2023, again assuming he earns the estimated good time of his sentence.  *Id.* at 1.

As described above, the defendant is currently serving a sentence related to his membership in two websites dedicated to the distribution and advertisement of child

pornography. He sought out the company of these like-minded offenders in a forum located in the dark depths of the Internet. The Tor network is specifically used in order to prevent someone attempting to monitor an Internet connection from learning what sites a user visits and preventing the sites from learning the user's physical location. The defendant not only signed up as a member of the websites, but regularly contributed to the content, including discussing the exploitive material. He encouraged others on the website to stay "safe". While the defendant admitted that he registered for the two websites described in the plea agreement, his computer also reflected notes which contained the true name and web address of other Tor network websites known to the devoted to the distribution and advertisement of child pornography. PA at 21. He admitted to collecting child pornography "since the 90's". *Id.* at 16.

A review of the defendant's Inmate Profile reflects that not only has the defendant not yet participated in BOP's Sex Offender Management Program, but also that the defendant *declined* treatment in the program on February 19, 2020. *See* BOP Inmate Profile, Exhibit 5. Despite the fact that the defendant collected child pornography since the 1990's, the defendant does not appear to recognize the importance of his participation in a standardized sex offender treatment program. He likewise does not make clear that he intends to participate in sex offender treatment upon release (despite the fact it is required as a condition of supervised release); only "SAA (Sex Addicts Anonymous) meetings and other counseling for himself and his family". Def. Mot. at 4. Participation in sex offender treatment is a mechanism for ensuring the safety of the community. The defendant's lack of participation in a sex offender program is yet another reason his motion for a reduction in his sentence should

20

be denied. *See United States v. Wooley*, No. 6:13-cr-00224-AA, 2020 WL 2490093, at *3 (D. Or. May 14, 2020) (denying compassionate release upon concluding that the defendant posed a danger to society in part due to the fact he had not completed BOP's sex offender treatment program); *United States v. Fischer*, No. CR ELH-14-0595, 2020 WL 2769986, at *6 (D. Md. May 27, 2020) (same).

The defendant collected and distributed child pornography and was an active participant in communities of pedophiles that covet images of child sexual exploitation. The seriousness of such a crime deserves a significant sentence. This Court recognized that seriousness when it sentenced him to 48 months.  Releasing the defendant after he has completed less than 20% of his 48-month sentence would undermine the goals set forth in 18 U.S.C. § 3553(a).

<u>CONCLUSION</u>

The defendant has not articulated an extraordinary and compelling reason for the reduction of his sentence and his motion should be denied.

Respectfully submitted,

JASON R. DUNN
United States Attorney

By:     s/ *Alecia L. Riewerts*
ALECIA L. RIEWERTS
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
E-mail: Alecia.Riewerts@usdoj.gov
Attorney for Government

## CERTIFICATE OF SERVICE

      I hereby certify that on this 11th day of September, 2020, I electronically filed the foregoing **GOVERNMENT'S RESPONSE TO DEFENDANT'S AMENDED MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email address:

**Wadi Muhaisen**

**Email:  wadi@muhaisenlaw.com**


                        By:  *s/ Alecia L. Riewerts*
                        ALECIA L. RIEWERTS
                        Assistant U.S. Attorney
                        U.S. Attorney's Office
                        1801 California Street, Suite 1600
                        Denver, CO 80202
                        Telephone: 303-454-0100
                        E-mail: Alecia.Riewerts@usdoj.gov